633 So.2d 828 (1994)
STATE of Louisiana
v.
Wilson ACEVEDO.
No. 93-KA-1474.
Court of Appeal of Louisiana, Fourth Circuit.
February 25, 1994.
Stay Order Recalled; Writ Denied March 31, 1994.
*829 Harry F. Connick, Dist. Atty., Mark D. Pethke, Asst. Dist. Atty., New Orleans, for appellee.
Martha L. Adams, Arthur A. Lemann, III & Assocs., New Orleans, for appellant.
Before BYRNES, PLOTKIN and LANDRIEU, JJ.
LANDRIEU, Judge.
On November 23, 1982 Wilson Acevedo was convicted by a jury of aggravated kidnapping in violation of La.Rev.Stat.Ann. § 14:44 (West 1982). He was sentenced on November 23, 1982 to serve mandatory life imprisonment at hard labor. On appeal, the defendant's counsel requested only a review of the record for errors patent. The conviction and sentence were affirmed. State v. Acevedo, 439 So.2d 1130 (La.App. 4th Cir. 1983). Claiming ineffective assistance of counsel on appeal, Acevedo filed an application for post conviction relief. Finding the claim meritorious under Lofton v. Whitley, 905 F.2d 885 (5th Cir.1990), this Court ordered that Acevedo be granted a new appeal.
Claiming that his actions were those of a desperately lonely man seeking companionship, Acevedo challenges the sufficiency of the evidence supporting his conviction. In accordance with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), we review the record evidence in the light most favorable to the prosecution to determine if the facts established by the direct evidence and inferred from the circumstances established by that evidence are sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Smith, 441 So.2d 739, 741 (La.1983) (citation omitted). The principle criteria of review under Jackson v. Virginia is rationality; irrational decisions to convict will be overturned. State v. Mussal, 523 So.2d 1305, 1310 (La.1988).
Before reviewing the evidence produced at Acevedo's trial, we examine the statutory framework of aggravated kidnapping. At the time of Acevedo's conviction, two statutory kidnapping offenses existed, aggravated kidnapping and simple kidnapping. The aggravated kidnapping statute, La.Rev.Stat. Ann. § 14:44 (West pre-1989 amendment), provides that:
Aggravated kidnapping is the doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure *830 a release of the person under the offender's actual or apparent control:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person.
Whoever commits the crime of aggravated kidnapping shall be punished by life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.
By contrast, the simple kidnapping statute, La.Rev.Stat.Ann. § 14:45 (West pre-1989 amendment), states in pertinent part:
A. Simple kidnapping is:
(1) the intentional and forcible seizing and carrying of any person from one place to another without his consent ...
B. Whoever commits the crime of simple kidnapping shall be fined not more than five thousand dollars, imprisoned with or without hard labor for not more than five years, or both.
In the case before us, the victim, Ms. Kathleen Plemer, testified at trial that she left her employer's apartment in the French Quarter between 1:15 and 1:30 A.M. on April 30, 1982. Ms. Plemer had trouble starting her vehicle, a Blazer with a camper top,[1] and Acevedo approached her and offered assistance. After starting the truck, Acevedo pulled out a gun,[2] stuck it into Ms. Plemer's side and said, "now, lets go for a ride ... just get in the truck and don't give me any trouble." Acevedo told Plemer that he wanted to go the bus station on Tulane Avenue and retrieve his baggage.[3] Ms. Plemer advised Acevedo that the truck needed gasoline and proceeded to an Exxon station at the corner of Claiborne Avenue and Canal Street. While Ms. Plemer put gasoline in the truck and paid the attendant in the glass booth, Acevedo remained in the truck. Making no attempt to alert the attendant, Ms. Plemer returned to the truck. Acevedo first wanted to go to Armstrong Park, but as they neared the park, Acevedo ordered Ms. Plemer to keep driving. Ms. Plemer circled the park, then drove toward her home in St. Bernard. While they were driving towards St. Bernard, Acevedo repeatedly stated that he wanted Ms. Plemer to go to a motel with him and to go out with him. Acevedo requested that Ms. Plemer pull off on "different little roads," but she refused, telling him "no, you couldn't do that; there'd be people around." Knowing that it was policy in St. Bernard for police to check vehicles stopped on the side of the road, Ms. Plemer informed Acevedo that she was getting tired and "needed to pull over for awhile." She then parked near the entrance of a subdivision where her brother-in-law, a policeman in St. Bernard, lived.
Ms. Plemer stated that "we stopped for awhile, and then he wanted me to get in the back of the truck. I got in the back of the truck. He made me take my shoes, my pantyhose, my clothes off, except for my blouse, which he undone my blouse; and my underclothes; and he was laying on top of me when, thank God, the police came." Acevedo warned Plemer to stay down and not say anything, that he was going to tell the police that they were sleeping on the side of the road.[4] When the police approached the vehicle, however, Ms. Plemer started screaming. Acevedo stuck his gun out the window and started yelling at the police. He then drove off at a high rate of speed. During the high speed chase through St. Bernard which followed, Ms. Plemer pulled on her pants, climbed into the passenger seat, and screamed at Acevedo to slow down. Acevedo failed to negotiate a curve and the truck crashed and flipped over, landing on its wheels.
Deputy Dominick McGuire of the St. Bernard Parish Sheriff's Office, testified that, while on patrol on April 30, 1982, at approximately 3:32 A.M., he observed the Plemer *831 vehicle parked on the side of the road. The deputy stopped his patrol car and approached the vehicle. The driver, Acevedo, told him there was no problem and pointed a chrome automatic-looking pistol out of the vehicle window. As Acevedo attempted to drive away, the deputy became aware of a partially disrobed woman in the back of the truck screaming for help. Deputy McGuire fired a warning shot in the air and another deputy, Deputy Soulier, shot the left front fender of the Plemer vehicle. After a high speed chase, the Plemer vehicle crashed, Acevedo was thrown from the vehicle, and the pistol was recovered from the floorboard. On inspection, the pistol used by Acevedo was discovered to be a toy gun. Deputy McGuire's testimony was corroborated by Deputy Soulier and Detective Raul Vallecillo.
Ms. Plemer was taken to Delaronde Hospital for treatment of injuries she sustained in the accident. As its only witness, the defense called Ms. Judy K. Speer, a registered nurse at Delaronde Hospital. Ms. Speer testified that Ms. Plemer told her that she had been kidnapped, but did not tell her of an attempted rape. Ms. Speer testified further that there was nothing in the medical report indicative of a rape.
The trial court instructed the jury, in part, that "a demand for sexual activity by the kidnapper from a person who has been forcibly seized and carried from one place to another satisfies the requirement that the kidnapper intended to force the person to give anything of value to the kidnapper in order to gain the release of the kidnapped victim." In order to convict Acevedo of aggravated kidnapping "you must find to your satisfaction, and beyond a reasonable doubt, that (1) the defendant forcibly seized Kathleen Plemer, and carried her from one place to another and that the defendant did so with the specific intent to force Kathleen Plemer to give up anything of prospective, present value, in order to secure her release; and third that the victim, the alleged victim, Kathleen Plemer was under the actual or apparent control of the defendant." Reasonable doubt was defined as "such a doubt as would give rise to a grave uncertainty."[5]
After an hour and a half of deliberations, the jury returned a verdict of guilty as charged of aggravated kidnapping. Acevedo was sentenced to mandatory life imprisonment at hard labor without any possibility of parole, probation, or suspended sentence.

DISCUSSION
The State suggests that this case is analogous to State v. Arnold, 548 So.2d 920 (La.1989) and we have only to determine whether Ms. Plemer believed she would be released upon gratification of Acevedo's demands. In Arnold, the defendant grabbed the victim as she attempted to unlock her truck, forced her into the truck and drove off. The victim cried out for help and attempted to escape, but the defendant pulled her back into the truck by her hair and warned her not to try it again. He continued to hold on to her hair as he was driving and ordered her to lean down on the seat so that no one would see her. During the entire drive, the defendant held a knife on the victim and told her that if she "didn't do what he said he would use the knife." The defendant stopped in the parking lot of an apartment complex and ordered the victim to remove her pants and underwear. He attempted to vaginally rape her three times but was unable to achieve penetration. Consequently, he forced her at knife point to perform oral sex. The issue before the Court in Arnold was whether under these circumstances the defendant could be found guilty of aggravated kidnapping when there was no explicit communication by the kidnapper to the victim that she would be released if she complied with his demands for sexual gratification. The Court analyzed the aggravated kidnapping statute, found that the critical distinction between the crime of aggravated kidnapping and the crime of simple kidnapping is the kidnapper's intent to extort, *832 and determined that the four elements constituting aggravated kidnapping are:
1. the forcible seizing and;
2. the carrying of any person from one place to another (the asportation element);
3. with the intent to force the victim, or some other person, to give up anything of apparent present or prospective value (the extortion element);
4. in order to secure the release of that person.
In Arnold, the Court determined that the first three elements of aggravated kidnapping were clearly met; the victim was clearly seized and carried from one place to another and, in accordance with Louisiana jurisprudence, the seizure of a victim with intent to commit rape constitutes an intent to force the victim to give up something of value.[6] The issue remaining before the Court was whether, under these circumstances where the kidnapper clearly intended to rape the victim, the statute required an explicit communication by the kidnapper to the victim that compliance with his sexual demands would result in the victim's safe release. The Court analyzed the fourth element of aggravated kidnapping and determined that when a kidnapper's words and actions manifested an intent to extort sexual gratification such that a reasonable person, given the totality of the circumstances, would believe that he or she would not be safely released without compliance, evidence of explicit communication by the defendant to the victim was unnecessary under § 14:44. Arnold, 548 So.2d at 924. Reasoning that "any person who was forcibly seized, brought to a remote location, held at knifepoint and threatened in no uncertain terms with the use of that weapon, would comply with the abductor's demands in hope of securing safe release," the Court found that the defendant's threat to "use the knife" plainly manifested an intent to force her to give in to his sexual demands in the hope of obtaining release and, thus, the evidence was sufficient to support a conviction of aggravated kidnapping. Id.
The victim in Arnold was brutalized and the defendant clearly intended to rape the victim; however, the facts before us are far more ambiguous. Acevedo carried a toy gun and originally wanted only to go to bus station. He told Ms. Plemer that he wanted to date her and go to a motel with her. Acevedo allowed Ms. Plemer to get out of the truck, pump gas, pay the attendant, drive past desolate roads, park on a major highway, and keep her underwear and blouse on. Approximately two hours passed between the time Ms. Plemer left her employer's apartment in the French Quarter and the time the St. Bernard sheriffs stopped to investigate Ms. Plemer's parked truck. Ms. Plemer did not report a rape attempt to the examining nurse and nothing in the medical report indicated rape.
Arnold does not require an explicit communication by the defendant when there is a clear intent to rape, looking rather to the defendant's intent and the victim's reasonable belief that compliance will result in a safe release. However, on the evidence before us we can guess at Acevedo's likely intentions but cannot find that Acevedo's actions clearly manifested an intent to force the victim to comply with his sexual demands in hopes of obtaining her release. There is no evidence that Acevedo removed his clothes or, in fact, attempted anything of a sexual nature beyond lying down on the mattress with the victim in the back of her truck. We decline to extend Arnold to include such circumstances.[7] As such, a rational juror could not have concluded that Acevedo was guilty of every element of the crime of aggravated kidnapping and his conviction for that offense cannot be sustained. We reverse Acevedo's conviction for aggravated kidnapping *833 and find him guilty of the lesser included offense of simple kidnapping. A remand to the trial court for sentencing on the simple kidnapping conviction is normal procedure, but in this case Acevedo has served more than ten years, twice the maximum term of imprisonment for simple kidnapping. Accordingly, we order Acevedo released.
REVERSED AND RENDERED; RELEASE ORDERED.
BYRNES, Judge, dissenting with reasons.
I respectfully dissent.
At issue is whether there is sufficient evidence to support the element to extort to support the jury conviction of aggravated kidnapping under LSA-R.S. 14:44.
In State v. Arnold, 548 So.2d 920 (La. 1989), the Louisiana Supreme Court stated that:
[T]he relevant factor in applying the fourth element of aggravated kidnapping is not whether the kidnapper explicitly communicated to the victim that performance of sexual acts would result in his or her release, but whether the kidnapper intended to extort sexual gratification from the victim by playing upon the victim's hope of release. This intent is manifested not merely by the kidnapper's words or actions, but by analyzing whether a reasonable person in the victim's place, given the totality of the circumstances, would believe that he or she would not be safely released unless he or she complied with the kidnapper's demands for sexual gratification. Arnold, Id., 548 So.2d at 924.
The majority notes that: "The victim in Arnold was brutalized and the defendant clearly intended to rape the victim; however, the facts before us are far more ambiguous." Although the majority appears to emphasize that the totality of circumstances must provide evidence of an intent to rape, the Supreme Court determined that:
... [T]he crucial question in determining whether an aggravated kidnapping has occurred is not whether the defendant had intent to release the victim at either the outset of the crime or indeed at any point during the crime. The more important question and the issue to be focused upon is whether the defendant sought to obtain something of value, be it sex or money or loss of simple human dignity, by playing upon the victim's fear and hope of eventual release in order to gain compliance with his demands. Arnold, Id., 548 So.2d at 925 (emphasis added).
In the present case the victim stated that about 3:30 a.m., after the defendant offered to help her get her vehicle started in the French Quarter, he stuck a gun in her side and said, "now let's take a ride. Just get in the truck and don't give me any trouble."
The majority states that, "Mr. Acevedo allowed Ms. Plemer to get out of the truck, pump gas, pay the attendant, drive past desolate roads, park on a major highway, and keep her underwear and blouse on."
After Detective Vallecillo informed the defendant of his Miranda rights when the Sheriff's deputies found the defendant at the scene of the crash and later at the hospital, the defendant stated that he was from San Lorenzo, Puerto Rico. Acevedo had flown to Houston and had taken a bus from Houston to New Orleans. He left his belongings in a locker at the bus station and went to the French Quarter. He did not have a place to live. This information supports the reasoning that Acevedo was unfamiliar with the area and allowed the victim to get gas and to drive past several deserted areas when Ms. Plemer told the defendant that there would be too many people around to stop. The victim testified that she hoped to get help at the gas station but did not want to get the female cashier involved. She explained that if the cashier had been a man, she would have hollered and maybe would have run. She related that she would have felt she had some help. Her reasoning was supported by the fact that she did scream when the officers approached. It was reasonable that, being unfamiliar with the area, the defendant let Ms. Plemer park on the shoulder of the highway, which was not a city street but was what appeared to be a remote location during the pre-dawn hours when Ms. Plemer testified that she didn't remember any cars passing. Although the victim knew of the policy of the St. Bernard Sheriff's deputies to investigate *834 vehicles parked on shoulders of the highway, considering that the defendant was not from the area, he was unaware of that policy.
Ms. Plemer further testified that the defendant wanted to get in the back of the truck, and "he made me take my shoes, my pantyhose, my clothes off, except my blouse; and my underclothes; and he was laying on top of me when, thank God, the police came." She stated that, "my blouse was opened, my underwear was undone, and myhe had my pants off" (emphasis added).[1] She also explained that when they saw the police pass and come back around, "[h]e [the defendant] pulled up his pants" (emphasis added).[2]
When asked why she went with the defendant or drove or undressed, Ms. Plemer explained that, "I did them because my life was threatened, I felt." Earlier she stated that, "I was afraid for my life."
The testimony of the eyewitness, Ms. Plemer, was corroborated by the testimony of the Sheriff's deputies. Deputy Dominick McGuire saw the victim in the backseat partially disrobed. Officers McGuire and Soulier stated that the victim started screaming, and that the defendant pointed a gun at the officers. Officer McGuire related that the defendant pulled a pistol, started to wave it at the officer and was going to show him what it was for. Deputy Soulier stated that he thought he was under the threat of a real weapon. Officer McGuire fired a shot in the air, and Officer Soulier fired a shot into the left front fender of the truck. The precarious nature of the victim's position was shown by the officers' testimony relative to the facts that the defendant cursed at the officers, pointed what they perceived to be a gun at them, and took off on a four-mile high speed chase at over a hundred miles per hour, resulting in the victim's vehicle flipping over, and the defendant drove the vehicle into and cracked a lamp post in half.
Nurse Judy K. Speer testified that at Delaronde Hospital she "had no independent recollection that evening with regard to Ms. Plemer's condition.... I don't recall if we really got into a conversation about it. I spent most of my time with the gentleman [Acevedo], as he was most seriously injured." Although the medical report does not reflect that a rape examination was performed, the State is not required to demonstrate that an actual rape occurred but must show that Acevedo's actions clearly manifested an intent to force the victim to comply with his sexual demands in hopes of obtaining her release.
There is no statutory or jurisprudential rule that requires that eyewitness testimony be corroborated. State v. Green, 613 So.2d 263 (La.App. 4 Cir.1992). The credibility of the witnesses is a matter to be decided by the trier of fact. State v. Richardson, 425 So.2d 1228 (La.1983); Green, supra. Considering that the victim testified that she felt her life was threatened; she complied with the defendant's demands to disrobe; the defendant was on top of her on the highway when the police drove by; and then the defendant pulled up his pants, there was evidence from which a rational trier of fact could conclude that Acevedo intended to have the victim comply with his sexual demands by playing upon the victim's fear and hope of eventual release in order to gain compliance with his commands. As concluded by the Supreme Court in Arnold, supra, clearly any reasonable person who was forcibly seized, ordered to a remote area (the highway shoulder), and threatened with a weapon, would comply with the abductor's demands in the hope of securing a safe release. After reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the essential elements of the crime of aggravated kidnapping were shown beyond a reasonable doubt in accordance with the standard of review set forth in Jackson v. Virginia, 443 U.S. 307, 99 *835 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and as found by this court in State v. Acevedo, 439 So.2d 1130 (La.App. 4 Cir.1983). Such a logical determination should not be disturbed on appeal.
NOTES
[1] Ms. Plemer drove a "blazer" type vehicle with a camper roof.
[2] The weapon was later discovered to be a toy gun.
[3] The defendant arrived in New Orleans by bus earlier that day.
[4] Apparently, the back of the truck contained a mattress.
[5] Although the instruction in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), went beyond this one by including the terms "moral certainty" and "actual substantial doubt," the Louisiana Supreme Court found in State v. Harrison, 609 So.2d 789, 790 (La.1992), that the word "grave" suggests a higher degree of doubt than that required for acquittal under the reasonable doubt standard.
[6] State v. Winn, 412 So.2d 1337, 1347-48 (La. 1982).
[7] We note that, although inapplicable to Acevedo, the Louisiana legislature created a new offense in 1989 to cover "sexual misconduct" during the course of a simple kidnapping, second degree kidnapping. The penalty provision of this statute, La.Rev.Stat.Ann. § 14:44.1 (West 1991), provides for imprisonment at hard labor for not less than five years nor more than forty years and that at least two years of the sentence imposed shall be without benefit of parole, probation, or suspension of sentence.
[1] The majority states that Acevedo allowed Ms. Plemer to "keep her underwear and blouse on."
[2] The majority found that: "There was no evidence that Acevedo removed his clothes or, in fact, attempted anything of a sexual nature beyond lying down on the mattress with the victim in the back of her truck." However, a rational trier of fact could conclude from the testimony that the defendant intended to make sexual demands on the victim.